## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FT. PIERCE DIVISION

**MICHAEL GROSS and**
**ASHLEY GROSS,**                                    **CASE NO.:**

      **Plaintiff,**

**v.**

**NATIONAL CREDIT SYSTEMS, INC.,**
**TRANS UNION, LLC, EXPERIAN**
**INFORMATION SOLUTIONS, INC.,**
**and EQUIFAX INFORMATION SERVICES,**
**LLC,**

      **Defendants.**

_____/

## PLAINTIFFS' COMPLAINT
### JURY DEMAND

1.      Plaintiffs, MICHAEL and ASHLEY GROSS ("Plaintiffs") bring this action against Defendants NATIONAL CREDIT SYSTEMS, INC. ("NCS"), TRANS UNION, LLC ("Trans Union"), EXPERIAN INFORMATION SOLUTIONS, INC. ("Experian") and EQUIFAX INFORMATION SERVICES, LLC ("Equifax") for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et. seq.* (hereinafter "FCRA").

2.      Plaintiffs further allege violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*. (the "FDCPA") and Florida Consumer Collection Practices act, Florida Statute §559.72 *et. seq*. (the "FCCPA") against NCS and states the following in support:

### JURISDICTION AND VENUE

3.      This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

4.      Defendants' voluntary contact with Plaintiffs in Florida made it foreseeable that they would be hailed into a Florida court. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).

5.      Venue here is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in the Southern District of Florida.

6.      This Court has supplemental jurisdiction to hear all state law claims that are pleaded herein or that may subsequently arise pursuant to 28 U.S.C. § 1367.

## PARTIES

7.      Plaintiff Michael Gross is a natural person who, at all times relevant to this action is and was a resident of Florida and is a "consumer" as defined by 15 U.S.C. § 1681a(c), 15 U.S.C. §1692a(3) and Florida Statute §559.55(8).

8.      Plaintiff Ashley Gross is a natural person who, at all times relevant to this action is and was a resident of Florida and is a "consumer" as defined by 15 U.S.C. § 1681a(c), 15 U.S.C. §1692a(3) and Florida Statute §559.55(8).

9.      Defendant NCS is a Georgia Corporation with a principal place of business at 1775 The Exchange SE, Suite 300 Atlanta, GA 30339.

10.      At all times material hereto, NCS regularly collects or attempts to collect debts for other parties, and is a "debt collector" as defined under 15 U.S.C. 1692a(6) and Florida Statute §559.55(7).

11.      NCS uses instrumentalities of interstate commerce for the purpose of furnishing information on specific trade accounts to consumer reporting agencies. Trans Union, Equifax, and Experian shall be collectively referred to as the "Credit Reporting Agencies" or the "CRAs."

12.     These instrumentalities of interstate commerce are largely electronic, written, or telephonic communications which have effects on consumers and their credit reports within the state of Florida.

13.     Defendant Trans Union is a limited liability company incorporated under the laws of the State of Delaware, whose members are citizens of the state of Illinois. Trans Union is authorized to do business in and regularly conducts business in the State of Florida and engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports as defined in 15 U.S.C. § 1681d to third parties.

14.     Defendant, Experian is an Ohio corporation incorporated under the laws of the State of Delaware. Experian is authorized to do business in the State of Florida and engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports as defined in 15 U.S.C. § 1681d to third parties.

15.     Defendant, Equifax is a Georgia limited liability company incorporated under the laws of the State of Delaware. Equifax is authorized to do business in the State of Florida and engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports as defined in 15 U.S.C. § 1681d to third parties.

### _Long- Arm Jurisdiction_

16.     Florida's long-arm "appl[ies] to defendants committing tortious acts outside the state that cause injury in Florida." *See Posner v. Essex Ins. Co*., 178 F.3d 1209, 1217 (11th Cir. 1999). Accordingly, the long-arm statute confers personal jurisdiction over a nonresident defendant who is alleged to have committed a tortious act in Florida, which causes injury to a plaintiff. *Id.* at 1216. "[A] nonresident defendant may commit a tortious act within the state by

electronic, written, or telephonic communication into Florida so long as the cause of action arises from such communication." *See Smith v. Trans-Siberian Orchestra,* 728 F. Supp. 2d 1315, 1321 (M.D. Fla. 2010).

17.     The purpose of the FCRA is to safeguard against the improper reporting of information on a credit report either by the credit reporting agency or by the furnisher of credit information. *See Myers v. Bennett Law Offices,* 238 F.3d 1068, 1074 (9th Cir. 2001) (reversing a dismissal for lack of personal jurisdiction on an FCRA claim while stating the "mental distress can only be felt where Plaintiffs' 'sensibilities' reside -that is, Nevada."). Numerous courts have found personal jurisdiction in FCRA cases where the plaintiff resides and was injured by an out-of-state defendant's actions. *See Marcus Forbes v. Concord Advice, LLC et al.*, No. 8:19-cv-02980-VMC-CPT, Dkt. 73 at 16-18 (M.D. Fla. Apr. 21, 2020) (listing cases consistent with personal jurisdiction over nonresident defendants in FCRA cases).

18.     Long-Arm jurisdiction exists under the FCRA claims made against Defendants because Plaintiffs reside in the area where the effect of the communications was felt.

19.     Additionally, specific jurisdiction exists over NCS under Fla. Stat. 48.193(1)(a)(2) because it committed out-of-state acts, that are codified torts under the FCRA and FDCPA which have caused damage to Plaintiffs in Florida.

20.     Personal jurisdiction exists over NCS because Plaintiffs live in the forum where they were injured by its actions. *See Koch v. Lake City Credit, LLC,* Case No: 6:19-cv-667-Orl-41GJK, at *5 (M.D. Fla. Jul. 23, 2019) (citing *Internet Sols. Corp. v. Marshall*, 39 So. 3d 1201, 1208 (Fla. 2010) (nonresidents can commit tortious acts in Florida by virtue of telephonic, electronic, or written communications into Florida)).  "[S]uits may be brought where a debtor receives a communication from a debt collector located elsewhere where the transmittal of those

communications is claimed to have violated debt collection laws." *See Alecca v. AMG Managing Ptnrs*., *LLC*, No. 3:13-cv-163, 2014 WL 2987702, at *6 (M.D. Fla. Jul. 2, 2014) (quoting *Sluys v. Hand*, 831 F. Supp. 321, 324 (S.D.N.Y. 1993).

21.     Accordingly, NCS has created minimum contacts with this forum by virtue of its telephonic, electronic, or written communications into Florida which violated the FCRA and FDCPA.

## STATUTORY FRAMEWORK
### THE FCRA

22.     The Fair Credit Reporting Act, 15 U.S.C. §1681 *et. seq.,* was originally enacted in 1970 for the purpose of regulating the collection, dissemination, and use of consumer credit information.

23.     Congress found that "[i]nnacurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." 15 U.S.C. §1681(a)(1).

24.     "The aim of the Fair Credit Reporting Act is to see that the credit reporting system serves the consumer as well as the industry. The consumer has a right to information which is accurate; he has a right to correct inaccurate or misleading information; he has a right to know when inaccurate information is entered into his file; he has a right to see that the information is kept confidential and is used for the purpose for which it is collected; and he has a right to be free from unwarranted invasions of his personal privacy." The Fair Credit Reporting Act seeks to secure these rights." Hearings on S. 823 Before the Subcomm. on Financial Institutions of the S. Comm. on Banking and Currency, 91st Cong. 2 (1969).

25.     A "furnisher of information" provides information about consumers' credit history to credit reporting agencies. 15 U.S.C. §1681s-2.

26.     "Furnishers of information" under the FCRA, pursuant to 15 U.S.C. §1681s-2(b) to conduct a reasonable investigation into each of the written disputes that it receives from the credit reporting agencies. *See also Hinkle v. Midland Credit Mgmt., Inc.,* 827 F.3d 1295, 1302 (11th Cir. 2016).

27.     Congress also found that "[c]onsumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers" and that "[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(3),(4).

28.     The FCRA requires credit reporting agencies to "follow reasonable procedures to assure maximum possible accuracy of" consumer reports. 15 U.S.C. § 1681e(b). If a consumer disputes information contained in their credit report, the FCRA requires a credit reporting agency to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller."15 U.S.C.S. § 1681i(a)(1)(A).

29.     In performing the reinvestigation, the FCRA requires a credit reporting agency to "review and consider all relevant information submitted by the consumer in the period described in paragraph (1)(A) with respect to such disputed information." 15 U.S.C.S. § 1681i(a)(4).

30.     If the disputed information is inaccurate or incomplete or cannot be verified, the consumer reporting agency "shall…(i)  promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the

reinvestigation; and (ii)  promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer." 15 U.S.C. § 1681(a)(5)(A)(i),(ii).

31.     The FCRA provides a private right of action against any person that violates the provisions of the FCRA. 15 U.S.C. §§ 1681o, 1691n.

32.     If the violation is negligent, the FCRA allows the consumer to recover actual damages (§ 1681o(a)); however, if the violation is willful, the consumer may recover any actual damages or statutory damages from not less than $100.00 and not more than $1,000. § 1681n(a).

33.     Under the FCRA, the term "consumer report" generally refers to:

a.     any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for:

b.     credit or insurance to be used primarily for personal, family, or household purposes;

c.     employment purposes; or

d.     any other purpose authorized under section 1681b of this title.

U.S.C. § 1681a(d)(1).

34.     The terms "consumer report", "credit report", and "consumer credit report" are used synonymously herein.

*National CRAs and Furnishers Communicate Consumer Disputes and Responses via the E-Oscar Reporting Platform*

35.     The FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to the CRAs may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file. 15 U.S.C. § 1681i(a)(5)(D).

36.     To comply with the automated dispute reinvestigation requirements of the FCRA, Trans Union, Equifax, and Experian along with Innovis Data Solutions, Inc., developed and implemented a browser-based software system that allows the CRAs to electronically notify furnishers quickly and easily of disputed credit reporting information, and for furnishers to quickly and easily respond to such disputes following the furnisher's investigation of the disputed information.

37.     The system is commonly referred to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant. *See* http://www.e-oscar.org/ (last accessed July 26, 2024).

38.     The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Data Form ("AUD") processing, as well as other consumer-dispute-related processes.   *See* https://www.e-oscar.org/gettingstarted (last accessed July 26, 2024).

39.     The National CRAs provide notice of a consumer's dispute to data furnishers in the ACDV format and forward the ACDV to the furnisher through e-OSCAR.

40.     If a furnisher's investigation of a consumer's dispute determines that the information in dispute is incomplete or inaccurate, the FCRA requires the furnisher to correct the information not only with the CRA that sent the ACDV, but with all other CRAs to whom the furnisher reported that information. 15 U.S.C. § 1681s-2(b)(1)(D).

41.     The e-OSCAR system facilitates the furnisher's compliance with 15 U.S.C. § 1681s-2(b)(1)(D) by sending a "Carbon Copy" of an ACDV response "to each CRA with whom the [furnisher] has a reporting relationship" in addition to the response to the initiating CRA. *See* https://www.e-oscar.org/gettingstarted (last accessed July 26, 2024).

42.     Additionally, a furnisher can manually correct a tradeline with a CRA other than the one that initiated a dispute by sending an AUD within e-OSCAR.

43.     Trans Union, Experian, and Equifax each require data furnishers that report to them respectively to register with and use e-OSCAR, and state that e-OSCAR is "in compliance with FCRA and Metro 2 standards." *See*, https://www.transunion.com/data-reporting/support-teams (last accessed July 26, 2024).

**The FDCPA**

44.     The FDCPA provides, in relevant part: A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section: (2) The false representation of -- (A) the character, amount, or legal status of any debt … 15 U.S.C. § 1692e.

45.     A consumer has a right under the FDCPA to receive information from a debt collector that is not "false, deceptive, or misleading." *See Pralle v. Cooling & Winter, LLC*, No. 2: 16-cv-865-FtM-99CM (M.D. Fla. May 2, 2017).

46.     The FDCPA defines the term "consumer" as "any natural person obligated or *allegedly obligated* to pay any debt." *See* 15 U.S.C. § 1692a(3) (emphasis added).

47.     The FDCPA defines the term "debt" as "any obligation or *alleged obligation* of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." *See* 15 U.S.C. § 1692a(5) (emphasis added).

48.     The FDCPA defines the term "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due *or asserted to be owed or due another*." *See* 15 U.S.C. § 1692a(6) (emphasis added).

49.     "The FDCPA does not ordinarily require proof of intentional violation and, as a result, is described by some as a strict liability statute." *See LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1190 (11th Cir. 2010) (citing 15 U.S.C. § 1692k).

50.     For the purposes of the claims brought in this action, the applicable standard under the FDCPA in the Eleventh Circuit is "the least sophisticated" consumer test. *See Jeter v. Credit Bureau, Inc*., 760 F.2d 1168, 1175 (11th Cir. 1985) (adopting the test enunciated in *Exposition Press Inc. v. FTC*, 295 F.2d 869 (2d Cir. 1961)).

51.     The principles underlying the FDCPA must be implemented for "the public— that vast multitude which includes the ignorant, the unthinking and the credulous."  *See Jeter*, 760 F.2d at 1172-73 (internal citations omitted).   The "fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced." *Id*. at 1173 (internal citations omitted).

52.     There is only one affirmative defense to liability for a violation of the FDCPA, the "bona fide error" defense. *See* 15 U.S.C. §1692k(c).

53.     To take advantage of this defense, the defendant must show by the preponderance of the evidence that its violation of the Act was not intentional, was a bona fide error, and occurred despite the maintenance of procedures reasonably adapted to avoid any such error. *See Edwards v. Niagara Credit Solutions, Inc.*, 584 F.3d 1350, 1352-53 (11th Cir. 2009).

**The FCCPA**

54.     The FCCPA's goal is to "provide the consumer with the most protection possible." *See LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1192 (11th Cir. 2010) (citing Fla. Stat. § 559.552).

55.     The FCCPA provides that no person shall "claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when such person knows that the right does not exist." *See* Fla. Stat. § 559.72(9).

56.     "The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper, including enjoining the defendant from further violations of this part." *See* Fla. Stat. §559.77(2).

57.     As consumers, Plaintiffs have a private right of action against NCS pursuant to Florida Statute §559.77(2), which provides that "[a]ny person who fails to comply with any provision of s. 559.72 is liable for actual damages and for additional statutory damages . . . not exceeding $1,000, together with court costs and reasonable attorney's fees incurred by the plaintiff." (omissions added).

**FACTUAL ALLEGATIONS**

58.     Plaintiffs entered into a rental lease agreement with The Adelaide Apartments ("The Adelaide") in Orlando, Florida to rent an apartment from March 2020 through March 2021.

59.     In July 2020, Plaintiffs made the decision to terminate the lease agreement early and notified The Adelaide leasing office of their intention to do so.

60.     Plaintiffs were informed by The Adelaide's assistant community manager, Ms. Justina Ramos, that they would be required to pay $2,726.00 to terminate the lease agreement early ("Lease Termination Payment").

61.     Plaintiffs vacated the apartment at The Adelaide on July 31, 2020.

62.     On September 23, 2020, Ms. Ramos contacted Plaintiffs via email regarding the outstanding Lease Termination Payment.

63.     Plaintiffs promptly responded to Ms. Ramos' email that same day inquiring about making the payment.

64.     On September 24, 2020, Ms. Ramos informed Plaintiffs via email that they "can make a payment with a cashier's check or money order only in person or by mail. The final payment plan date will expire on 10/31/20."

65.     On October 3, 2020, Plaintiffs attempted to make the outstanding Lease Termination Payment in person, but Plaintiffs were unable to do so because the leasing office closed earlier unexpectedly.

66.     On October 3, 2020, Plaintiffs sent an email to Ms. Ramos about rescheduling the appointment.

67.     On October 5, 2020, Ms. Ramos reminded Plaintiffs that they could also submit the outstanding Lease Termination Payment by mail which Plaintiffs ultimately chose to do.  Ms. Ramos further confirmed the address to which Plaintiffs should mail the payment and suggested that Plaintiffs mail the payment through certified mail.

68.     On October 16, 2020, Plaintiffs mailed Western Union money orders to The Adelaide totaling $2,726.00 through the United States Postal Service certified mail which were delivered to The Adelaide on October 21, 2020.

69.     Plaintiffs contacted Ms. Ramos via telephone and confirmed that she was in receipt of the Western Union money orders which satisfied the outstanding Lease Termination Payment.

70.     However, The Adelaide failed to apply the Western Union money orders payment to Plaintiffs' account, charged off the Lease Termination Payment on or about October 23, 2020 and engaged the services of three separate debt collectors including Defendant NCS to collect an additional $2,726.00 from Plaintiffs that they did not owe.

71.     On or about November 23, 2020, The Adelaide applied Plaintiffs' $1,500 rental surety bond to the account reducing the amount of the erroneous debt to $1,226 (hereinafter the "Debt").

72.     At all times relevant hereto, the Debt at issue was primarily for personal, family, or household purposes.

73.     Defendant NCS engaged in collection activities against Plaintiffs by placing telephone calls to Plaintiff Michael Gross and reporting the collection account to both Plaintiffs' credit files with Defendants Trans Union, Experian and Equifax in an attempt to coerce Plaintiffs to pay the alleged Debt.

74.     Plaintiffs informed Defendant NCS on numerous occasions that they made the Lease Termination Payment and that they no longer owed the Debt to The Adelaide.

75.     Plaintiff Michael Gross mailed letters dated September 26, 2023 to the credit reporting agencies with a courtesy copy of each letter to NCS.  With his dispute letter, Plaintiff Michael Gross included receipts from the Western Union money orders and tracking information from the United States Postal Service showing that the money orders were delivered.

76.     Plaintiff Michael Gross received investigation results from Trans Union dated October 26, 2023 indicating that it had deleted the NCS collection account from his credit report.

77.     Plaintiff Michael Gross received investigation results from Experian dated October 26, 2023 indicating its intent to continue reporting the NCS collection account on his credit report.

13

78.     Plaintiff Michael Gross received investigation results from Equifax dated October 26, 2023 indicating its intent to continue reporting the NCS collection account on his credit report.

79.     Plaintiff Ashley Gross mailed letters dated January 10, 2024 to the credit reporting agencies with a courtesy copy of each letter to NCS.  With her dispute letter, Plaintiff Ashley Gross included receipts from the Western Union money orders and tracking information from the United States Postal Service showing that the money orders were delivered.

80.     Plaintiff Ashley Gross received investigation results from Trans Union dated February 14, 2024 indicating its intent to continue reporting the NCS collection account on her credit report.

81.     Plaintiff Ashley Gross received investigation results from Experian dated February 10, 2024 indicating its intent to continue reporting the NCS collection account on her credit report.

82.     Plaintiff Ashley Gross received investigation results from Equifax dated February 10, 2024 indicating its intent to continue reporting the NCS collection account on her credit report.

83.     Notwithstanding the above, Plaintiff Ashley Gross obtained a copy of her Equifax credit report dated March 20, 2024 showing that NCS was now reporting the alleged unpaid balance of the account as $2,726.00 instead of the $1,226.00 it was reporting prior to her dispute.

84.     Furthermore, on January 29, 2024, Plaintiff Ashley Gross received a telephone call from a male representative of The Adelaide who informed her that The Adelaide believed that the issue with the collection account on Plaintiffs' credit reports had been previously corrected and offered to assist in resolving the issue.

85.     Defendants' derogatory and inaccurate credit reporting of the NCS collection account on Plaintiffs' credit reports negatively reflect upon Plaintiffs' financial obligations, credit score and credit worthiness to existing and potential creditors.

86.     On or about December 5, 2023, Plaintiff Michael Gross was denied a personal loan with Citibank based on the information in his Equifax credit report which included the derogatory and inaccurate NCS collection account.

87.     On or about January 16, 2024, Plaintiff Michael Gross was denied a home equity line of credit with Bank of America based on the information in his Experian credit report which included the derogatory and inaccurate NCS collection account.

88.     In or around June 2024, Plaintiffs applied for a mortgage loan in the amount $450,000 with The Mortgage Firm.

89.     In or around July 17, 2024, Plaintiffs were pre-approved for roughly 12% of the mortgage loan amount they were seeking with less favorable terms based on the information in their credit reports with Equifax, Experian and Trans Union which included the derogatory and inaccurate NCS collection account.

90.     Further, Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *See Pedro v. Equifax, Inc.*, 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *See Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp.*, 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14- 01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered

intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc.*, No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc.*, No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

## COUNT I – VIOLATIONS OF 15 U.S.C. §1681s-2(b)
## AGAINST NCS

91.     Plaintiffs incorporate by reference paragraphs 1, 3-12, 16-26, 30-43 and 58-90 as if fully stated herein.

92.     NCS is a furnisher under the FCRA because it provides information concerning consumers to credit reporting agencies.

93.     NCS violated 15 U.S.C. §1681s-2(b) by failing to fully and properly investigate Plaintiffs' disputes when it failed to review all relevant information provided by the CRAs.

94.     Additionally, NCS violated §1681s-2(b) by failing to accurately respond or completely failing to respond to Plaintiffs' disputes sent to the CRAs.

95.     As a result of NCS' violations of the FCRA, Plaintiffs have been damaged.

96.     Plaintiffs' damages include damages for emotional distress associated with the NCS collection account not being corrected, credit denials, credit being granted at less favorable terms as a result of the account being viewed by credit grantors, loss of credit and the opportunity

to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

97.     NCS negligently violated FCRA entitling Plaintiffs to recover under 15 U.S.C. §1681o.

98.     Additionally, NCS committed a willful violation of the FCRA entitling Plaintiffs to recover under 15 U.S.C. §1681n(a).

99.     Plaintiffs are entitled to an award of prevailing party attorney's fees pursuant to 15 U.S.C. §1681.

WHEREFORE, Plaintiffs pray this Honorable Court to enter the following relief against NCS in the form of actual damages, statutory damages, punitive damages, attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT II - VIOLATIONS OF 15 U.S.C. §1692e(2)(a)
## AGAINST NCS

100.   Plaintiffs incorporate by reference paragraphs 2-12, 16-21, 44-53 and 58-90 as if fully stated herein.

101.   A "debt collector" violates 15 U.S.C. §1692e(2)(a) by "[t]he false representation of the character, amount, or legal status of any debt."

102.   NCS violated §1692e(2)(a) when it communicated false credit information to the credit reporting agencies by stating that Plaintiffs owe the Debt in an attempt to coerce Plaintiffs to pay the Debt which they did not owe.

103.   Each month that NCS communicated false credit information regarding Plaintiffs constitutes a violation of §1692e(2)(a).

104.   Additionally, NCS has violated §1692e(2)(a) each time the false credit information was viewed by a third party in connection with an account review, offer of credit, or application of credit.

105.   The FDCPA is a strict liability statute and accordingly NCS' conduct need not have been intentional, NCS' conduct violated the FDCPA regardless of its intentions. *See LeBlanc* at 1190.

106.   NCS' conduct is a violation of the FDCPA if it would be deceptive to the least-sophisticated consumer. *Id.* at 1194 (stating "[t]he fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced.")

107.   NCS, through its agents, representatives, and/or employees acting within the scope of their authority, violated 15 U.S.C. §1692e(2)(a).

108.   15 U.S.C. § 1692k(a) provides that a debt collector who fails to comply with any provision of the FDCPA with respect to any person is liable to such person for up to $1,000 in statutory damages, actual damages, the costs of the action, together with a reasonable attorney's fee as determined by the court.

109.   As a result of NCS' violations, Plaintiffs have suffered damages including but not limited to, emotional distress, credit denials, credit being granted at less favorable terms as a result of the account being viewed by credit grantors, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiffs pray this Honorable Court to enter the following relief against NCS in the form of actual damages, statutory damages and punitive damages pursuant to 15 U.S.C.

§ 1692k; attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and further relief including as the Court deems equitable and just under the circumstances.

### COUNT III - VIOLATIONS OF 15 U.S.C. §1692e(8)
### AGAINST NCS

110.    Plaintiffs incorporate by reference paragraphs 2-12, 16-21, 44-53 and 58-90 as if fully stated herein.

111.    A "debt collector" violates 15 U.S.C. §1692e(8)  by "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed."

112.    NCS violated §1692e(8) when it communicated false credit information to the credit reporting agencies by stating that Plaintiffs owe the Debt in an attempt to coerce Plaintiffs to pay the Debt which they did not owe.

113.    Each month that NCS communicated false credit information regarding Plaintiffs constitutes a violation of §1692e(8).

114.    Additionally, NCS has violated §1692e(8) each time the false credit information was viewed by a third party in connection with an account review, offer of credit, or application of credit.

115.    The FDCPA is a strict liability statute and accordingly NCS' conduct need not have been intentional, NCS' conduct violated the FDCPA regardless of its intentions. *See LeBlanc* at 1190.

116.    NCS' conduct is a violation of the FDCPA if it would be deceptive to the least-sophisticated consumer. *Id.* at 1194 (stating "[t]he fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced.")

117.   NCS, through its agents, representatives, and/or employees acting within the scope of their authority, violated 15 U.S.C. §1692e(8).

118.   15 U.S.C. § 1692k(a) provides that a debt collector who fails to comply with any provision of the FDCPA with respect to any person is liable to such person for up to $1,000 in statutory damages, actual damages, the costs of the action, together with a reasonable attorney's fee as determined by the court.

119.   As a result of NCS' violations, Plaintiffs have suffered damages including but not limited to, emotional distress, credit denials, credit being granted at less favorable terms as a result of the account being viewed by credit grantors, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiffs pray this Honorable Court to enter the following relief against NCS in the form of actual damages, statutory damages and punitive damages pursuant to 15 U.S.C. § 1692k; attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and further relief including as the Court deems equitable and just under the circumstances.

### COUNT IV - VIOLATIONS OF 15 U.S.C. §1692e(10) AGAINST NCS

120.   Plaintiffs incorporate by reference paragraphs 2-12, 16-21, 44-53 and 58-90 as if fully stated herein.

121.   A "debt collector" violates 15 U.S.C. §1692e(10)  by "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer."

122.   NCS violated §1692e(10) when it communicated false credit information to the credit reporting agencies by stating that Plaintiffs owe the Debt in an attempt to coerce Plaintiffs to pay the Debt that they did not owe.

123.     Each month that NCS communicated false credit information regarding Plaintiffs constitutes a violation of §1692e(10).

124.     Additionally, NCS has violated §1692e(10) each time the false credit information was viewed by a third party in connection with an account review, offer of credit, or application of credit.

125.     The FDCPA is a strict liability statute and accordingly NCS' conduct need not have been intentional, NCS' conduct violated the FDCPA regardless of its intentions. *See LeBlanc* at 1190.

126.     NCS' conduct is a violation of the FDCPA if it would be deceptive to the least-sophisticated consumer. *Id.* at 1194 (stating "[t]he fact that a false statement may be obviously false to those who are trained and experienced does not change its character, nor take away its power to deceive others less experienced.")

127.     NCS, through its agents, representatives, and/or employees acting within the scope of their authority, violated 15 U.S.C. §1692e(8).

128.     15 U.S.C. § 1692k(a) provides that a debt collector who fails to comply with any provision of the FDCPA with respect to any person is liable to such person for up to $1,000 in statutory damages, actual damages, the costs of the action, together with a reasonable attorney's fee as determined by the court.

129.     As a result of NCS' violations, Plaintiffs have suffered damages including but not limited to, emotional distress, credit denials, credit being granted at less favorable terms as a result of the account being viewed by credit grantors, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiffs pray this Honorable Court to enter the following relief against NCS in the form of actual damages, statutory damages and punitive damages pursuant to 15 U.S.C. § 1692k; attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT V – VIOLATIONS OF FLA. STAT. §559.72(9)
## AGAINST NCS

130.    Plaintiffs incorporate by reference paragraphs 2-12 and 54-90 as if fully stated herein.

131.    At all relevant times to this action, NCS is subject to and must abide by the laws of Florida, including Fla. Stat. §559.72.

132.    NCS violated Florida Statute § 559.72(9) by claiming, attempting, or threatening to enforce a debt when NCS knew that the debt was not legitimate, or asserting the existence of some other legal right when NCS knew that right did not exist.

133.    Specifically, NCS continued contacting Plaintiffs by telephone and reported the Debt on Plaintiffs' credit reports in an attempt to collect the Debt after being notified that Plaintiffs no longer owed a debt to The Adelaide.

134.    "Any person who fails to comply with any provision of § 559.72 is liable for actual damages and for additional statutory damages as the court may allow, but not exceeding $1,000, together with court costs and reasonable attorney's fees incurred by the plaintiff. In determining the defendant's liability for any additional statutory damages, the court shall consider the nature of the defendant's noncompliance with § 559.72, the frequency and persistence of the non-compliance, and the extent to which the noncompliance was intentional." Fla. Stat. 559.77(2) (emphasis added).

135. As a result of NCS' violations, Plaintiffs suffered damages, including but not limited to, time spent addressing NCS' illegal collection practices and related emotional distress.

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in their favor and against NCS for: actual damages, statutory damages, and punitive damages pursuant to Fla. Stat. §559.77; attorneys' fees, litigation expenses and costs of the instant suit; and such other or further relief as the Court deems proper.

## COUNT VI - VIOLATIONS OF 15 U.S.C. §1681i
### AGAINST TRANS UNION AS TO PLAINTIFF ASHLEY GROSS ONLY

136. Plaintiff incorporates by reference paragraphs 1, 3-7, 8, 13, 16-18, 22-43, 58-73, 79-80, 84-85 and 88-90 as if fully set forth herein.

137. At all times relevant hereto, Trans Union is and was a "consumer reporting agency" as provided for under the FCRA.

138. At all times relevant hereto, Plaintiff was a "consumer" as provided for under the FCRA.

139. During the relevant time frame, Trans Union received Plaintiff's disputes regarding the accuracy or completeness of the NCS collection account appearing on Plaintiff's consumer disclosure.

140. Trans Union violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Plaintiff's credit file after receiving actual notice of inaccuracies contained therein.

141. Additionally, Trans Union unreasonably relied on information provided by NCS, when readily verifiable information was provided by Plaintiff in the disputes placing Trans Union on notice that NCS' information was inaccurate and unreliable.

142. Trans Union's acts or omissions were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

23

143.     Alternatively, Trans Union negligently violated FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

144.     As a result of Trans Union's FCRA violations, Plaintiff suffered mental and emotional distress, credit denials, damage to her reputation for credit worthiness, loss of the ability to purchase and benefit from credit, time spent dealing with credit report disputes, and expenses associated with credit report disputes.

WHEREFORE, Plaintiff prays this Honorable Court to enter the following relief against Trans Union in the form of actual damages, statutory damages and punitive damages; attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT VII - VIOLATIONS OF 15 U.S.C. §1681e(b)
## AGAINST TRANS UNION AS TO PLAINTIFF ASHLEY GROSS ONLY

145.     Plaintiff incorporates by reference paragraphs 1, 3-7, 8, 13, 16-18, 22-43, 58-73, 79-80, 84-85 and 88-90 as if fully set forth herein.

146.     At all times relevant hereto, Trans Union is and was a "consumer reporting agency" as provided for under the FCRA.

147.     At all times relevant hereto, Plaintiff was a "consumer" as provided for under the FCRA.

148.     Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files it publishes and maintains concerning the Plaintiff.

149.     Any users of credit reports that viewed the NCS account saw the inaccurate information.

150.     Even after Plaintiff's disputes, the NCS account is still being reported.

151. Trans Union's acts and/or omissions were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

152. In the alternative, Trans Union negligently violated FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

153. As a result of Trans Union's failures to comply with the FCRA, Plaintiff suffered mental and emotional distress, credit denials, damage to her reputation for credit worthiness, loss of the ability to purchase and benefit from credit, time spent dealing with credit report disputes, and expenses associated with credit report disputes.

WHEREFORE, Plaintiff prays this Honorable Court to enter the following relief against Trans Union in the form of actual damages, statutory damages and punitive damages; attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT VIII – VIOLATIONS OF 15 U.S.C. §1681i
## AGAINST EXPERIAN

154. Plaintiffs incorporate by reference paragraphs 1, 3-8, 14, 16-18, 22-43, 58-73, 75, 77, 79, 81, 84-85 and 87-90 above as if fully set forth herein.

155. At all times relevant hereto, Experian is and was a "consumer reporting agency" as provided for under the FCRA.

156. At all times relevant hereto, Plaintiffs were each a "consumer" as provided for under the FCRA.

157. During the relevant time frame, Experian received Plaintiffs' disputes regarding the accuracy of the account reported by NCS on Plaintiffs' credit reports.

158. Experian violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Plaintiffs' credit files after receiving actual notice of inaccuracies contained therein.

159.     Additionally, Experian unreasonably relied on information provided by NCS, when readily verifiable information was provided by Plaintiffs in the dispute letters placing Experian on notice that NCS' information was inaccurate and unreliable.

160.     Experian's acts and/or omissions were willful, rendering it liable to Plaintiffs for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

161.     In the alternative, Experian negligently violated the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

162.     As a result of Experian's violations of the FCRA, Plaintiffs suffered mental and emotional distress, credit denials, damage to their reputation for credit worthiness, credit denials, loss of the ability to purchase and benefit from credit, time spent dealing with credit report disputes, and expenses associated with credit report disputes.

WHEREFORE, Plaintiffs pray this Honorable Court to enter the following relief against Experian in the form of actual damages, statutory damages and punitive damages; attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and further relief including as the Court deems equitable and just under the circumstances.

### COUNT IX – VIOLATIONS OF 15 U.S.C. §1681e(b) AGAINST EXPERIAN

163.     Plaintiffs incorporate by reference paragraphs 1, 3-8, 14, 16-18, 22-43, 58-73, 75, 77, 79, 81, 84-85 and 87-90 above as if fully set forth herein.

164.     At all times relevant hereto, Experian is and was a "consumer reporting agency" as provided for under the FCRA.

165.     At all times relevant hereto, Plaintiffs were each a "consumer" as provided for under the FCRA.

166.     During the relevant time frame, Experian received Plaintiffs' disputes regarding the accuracy of the account reported by NCS on Plaintiffs' credit reports.

167.     Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files it publishes and maintains concerning the Plaintiffs.

168.     Any users of credit reports that viewed the NCS account saw the inaccurate information.

169.     Even after Plaintiffs' written disputes, the NCS account is still being reported.

170.     Experian's acts and/or omissions were willful, rendering it liable to Plaintiffs for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

171.     In the alternative, Experian negligently violated the FCRA entitling Plaintiffs to recover under 15 U.S.C. §1681o.

172.     As a result of Experian's violations of the FCRA, Plaintiffs suffered mental and emotional distress, credit denials, damage to their reputation for credit worthiness, credit denials, loss of the ability to purchase and benefit from credit, time spent dealing with credit report disputes, and expenses associated with credit report disputes.

WHEREFORE, Plaintiffs pray this Honorable Court to enter the following relief against Experian in the form of actual damages, statutory damages and punitive damages; attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT X – VIOLATIONS OF 15 U.S.C. §1681i
## AGAINST EQUIFAX

173.     Plaintiffs incorporate by reference paragraphs 1, 3-8, 15-18, 22-43, 58-73, 75, 78-79, 82-84, 86 and 88-90 as if fully set forth herein.

174.    At all times relevant hereto, Equifax is and was a "consumer reporting agency" as provided for under the FCRA.

175.    At all times relevant hereto, Plaintiffs were each a "consumer" as provided for under the FCRA.

176.    During the relevant time frame, Equifax received Plaintiffs' disputes regarding the accuracy of the account reported by NCS Plaintiffs' credit reports.

177.    Equifax violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Plaintiffs' credit files after receiving actual notice of inaccuracies contained therein.

178.    Additionally, Equifax unreasonably relied on information provided by NCS, when readily verifiable information was provided by Plaintiffs in the dispute letters placing Equifax on notice that NCS' information was inaccurate and unreliable.

179.    Equifax's acts and/or omissions were willful, rendering it liable to Plaintiffs for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

180.    In the alternative, Equifax negligently violated the FCRA entitling Plaintiffs to recover under 15 U.S.C. §1681o.

181.    As a result of Equifax's violations of the FCRA, Plaintiffs suffered mental and emotional distress, credit denials, damage to their reputation for credit worthiness, credit denials, loss of the ability to purchase and benefit from credit, time spent dealing with credit report disputes, and expenses associated with credit report disputes.

WHEREFORE, Plaintiffs pray this Honorable Court to enter the following relief against Equifax in the form of actual damages, statutory damages and punitive damages; attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT XI – VIOLATIONS OF 15 U.S.C. §1681e(b)
## AGAINST EQUIFAX

182.    Plaintiffs incorporate by reference paragraphs 1, 3-8, 15-18, 22-43, 58-73, 75, 78-79, 82-84, 86 and 88-90 as if fully set forth herein.

183.    At all times relevant hereto, Equifax is and was a "consumer reporting agency" as provided for under the FCRA.

184.    At all times relevant hereto, Plaintiffs were each a "consumer" as provided for under the FCRA.

185.    During the relevant time frame, Equifax received Plaintiffs' disputes regarding the accuracy of the account reported by NCS on Plaintiffs' credit reports.

186.    Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files it publishes and maintains concerning the Plaintiffs.

187.    Any users of credit reports that viewed the NCS account saw the inaccurate information.

188.    Even after Plaintiff's written dispute(s), the NCS account is still being reported.

189.    Equifax's acts and/or omissions were willful, rendering it liable to Plaintiffs for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

190.    In the alternative, Equifax negligently violated the FCRA entitling Plaintiffs to recover under 15 U.S.C. §1681o.

191.    As a result of Equifax's violations of the FCRA, Plaintiffs suffered mental and emotional distress, credit denials, damage to their reputation for credit worthiness, credit denials, loss of the ability to purchase and benefit from credit, time spent dealing with credit report disputes, and expenses associated with credit report disputes.

WHEREFORE, Plaintiffs pray this Honorable Court to enter the following relief against Equifax in the form of actual damages, statutory damages and punitive damages; attorneys' fees, litigation expenses and costs, interest as permitted by law, and such other and further relief including as the Court deems equitable and just under the circumstances.

## JURY DEMAND

192.    Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

**SHARMIN & SHARMIN, P.A.**

*/s/ Eiman Sharmin*
Eiman Sharmin, Esq.
eiman@sharminlaw.com
FBN: 716391
830 North Federal Highway
Lake Worth, FL 33460
Main: 561-655-3925
Fax: (844) 921-1022
*Attorneys for Plaintiff*